TOWN OF MIDDLEBOROUGH & another[1] *vs.* HOUSING APPEALS
COMMITTEE[2] & another.[3]

Plymouth. March 8, 2007. - July 20, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Housing. Zoning,* Comprehensive permit, Housing appeals committee, Low
and moderate income housing. *Waiver. Practice, Civil,* Waiver.

This court agreed to address the question whether funding through the New
   England Fund program of the Federal Home Loan Bank of Boston
   constituted a valid government subsidy under G. L. c. 40B, regardless of
   the merits of any party's claim regarding waiver, where the issue had been
   fully briefed and argued, and where public policy would benefit from the
   elimination of any uncertainty surrounding the question. [519-522]
Discussion of the New England Fund program of the Federal Home Loan
   Bank of Boston. [522-523]
Discussion of the applicable standards when reviewing the decision of an
   administrative agency charged by the Legislature with promulgating regula-
   tions to implement a particular statute. [523-524]
The conclusion of the Housing Appeals Committee of the Department of
   Housing and Community Development, that a financing commitment
   through the New England Fund program of the Federal Home Loan Bank
   of Boston, advancing construction funds to a developer of low or moderate
   income housing at a below-market interest rate, constituted a government
   subsidy within the meaning of G. L. c. 40B, §§ 20-23 (act), was entitled to
   substantial deference, where that conclusion was not contrary to the plain
   language of the act and its underlying purpose. [524-530]

CIVIL ACTION commenced in the Superior Court Department on
August 12, 2002.

The case was heard by *Gary A. Nickerson,* J., on motions for
judgment on the pleadings.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

[1]Board of Appeals of Middleborough. The town and the board have joined
in one appeal.

[2]Of the Massachusetts Department of Housing and Community Development.
See G. L. c. 40B, §§ 22-23.

[3]Delphic Associates, LLC.

*Jonathan D. Witten* (*Barbara M. Huggins* with him) for the plaintiffs.

*Pierce O. Cray*, Assistant Attorney General, for Housing Appeals Committee.

*Joseph J. Czerwonka*, for Delphic Associates, LLC, was present but did not argue.

*Paul D. Wilson & Benjamin B. Tymann*, for Citizens' Housing and Planning Association & others, amici curiae, submitted a brief.

*David S. Weiss & Michael S. Rabieh*, for Fairfield Residential LLC & others, amici curiae, submitted a brief.

MARSHALL, C.J. We consider in this case whether a financing commitment given under the New England Fund of the Federal Home Loan Bank of Boston (FHLBB) to the developer of a planned low or moderate income residential housing project qualifies the project as one "subsidized by the federal or state government" within the meaning of the comprehensive permitting statute, G. L. c. 40B, §§ 20-23 (act).[4] The issue arises on an appeal by the town of Middleborough and the board of appeals of Middleborough (board) (collectively, Middleborough) from a Superior Court judgment affirming a decision of the Housing Appeals Committee (committee) of the Department of Housing and Community Development. The defendant, Delphic Associates, LLC (Delphic), sought a comprehensive permit from the board, see G. L. c. 40B, § 22, which the board denied. Delphic appealed to the committee, which directed the board to issue the permit. The committee determined, and a judge in the Superior Court affirmed, that project funding under the New England Fund qualified as a valid subsidy program under the act. In a thoughtful and detailed opinion, the Appeals Court affirmed, although its analysis of whether a financing commitment under the New England Fund constituted a "subsidy" dif-

---

[4]General Laws c. 40B, § 20, defines "low or moderate income housing" as "any housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute, whether built or operated by any public agency or any nonprofit or limited dividend organization." See 760 Code Mass. Regs. § 31.01(2) (1993) (defining "fundability" for purposes of eligibility to submit application for comprehensive permit pursuant to G. L. c. 40B, §§ 20-23 [act]), set forth at note 8, *infra*.

fered from that of the committee and the judge in the Superior Court. See *Middleborough* v. *Housing Appeals Comm.*, 66 Mass. App. Ct. 39 (2006). We granted Middleborough's petition for further appellate review limited to the question noted above.[5] We affirm the judgment of the Superior Court.[6]

1. *Background.* The material facts are not in dispute. In order to place them in context we describe briefly the history of relevant portions of the act, which has been thoroughly canvassed in earlier opinions. See, e.g., *Dennis Housing Corp.* v. *Zoning Bd. of Appeals of Dennis*, 439 Mass. 71, 76-78 (2003); *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 347-354 (1973).

The act allows a public agency, nonprofit organization, or limited dividend organization interested in constructing low or moderate income housing to circumvent the often arduous process of applying to multiple local boards for individual permits and, instead, to apply to the local board of appeals for issuance of a single comprehensive permit. See G. L. c. 40B, § 21. An applicant who is denied a comprehensive permit or is granted the permit under conditions that make the proposed development "uneconomic," G. L. c. 40B, § 22, may appeal to the committee for a de novo review of whether the board's decision was "reasonable and consistent with local needs." See G. L. c. 40B, § 23. If the committee finds that the local board's action does not meet these standards, it may order that the comprehensive permit issue. *Id.* A party aggrieved by a decision of the committee may appeal to the Superior Court, see G. L. c. 30A, § 14,

---

[5]In the Superior Court and in the Appeals Court, Middleborough challenged the committee's decision that Delphic was entitled to a comprehensive permit on three other grounds: "that the committee ordered the issuance of a permit to a nonexistent entity; that the committee's decision assures only subdivision of the land and does not require construction of affordable housing units; and that there was denial of due process because only one member of the committee heard the evidence, and he made no preliminary report to the other committee members who cast votes." *Middleborough* v. *Housing Appeals Comm.*, 66 Mass. Ct. 39, 40 (2006). These challenges each were resolved in favor of the defendants, *id.* at 50-52, and are not before us.

[6]We acknowledge the amicus brief of the Citizens' Housing and Planning Association, Massachusetts Housing Finance Agency, and Massachusetts Housing Partnership. We also acknowledge the amicus brief of Fairfield Residential LLC, Hanover Company, JPI, Trammell Crow Residential, Criterion Development Partners, and Avalonbay Communities, Inc.

which will uphold the committee's determination if it is supported by substantial evidence, which is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 376. These steps were followed in this case, as we now describe.

In March, 2000, Delphic applied to the board for a comprehensive permit to subdivide a four-acre parcel in the town of Middleborough into ten buildable lots. Three of the lots were to be reserved for affordable housing.[7] Delphic informed the board that the project was eligible to receive funding through the New England Fund of the FHLBB. In that respect and pursuant to 760 Code Mass. Regs. § 31.01(2) (1993),[8] Delphic provided the board with a "project eligibility letter" confirming that eligibility that it had obtained from the Norwood Cooperative Bank (Norwood Bank), a member of the FHLBB. The proposed financing described in the project eligibility letter was to be provided by the FHLBB to the Norwood Bank through the New England Fund. Norwood Bank, in turn, would provide a loan to Delphic at below-market interest rates.[9] See *Middleborough* v. *Housing Appeals Comm., supra* at 44.

---

[7]To be eligible for a comprehensive permit under G. L. c. 40B, § 21, it is "commonly understood" that in a residential development with both affordable and market-rate units, at least twenty-five percent of the planned project must be set aside for owners or renters with incomes that do not exceed eighty per cent of the area median income. See Stuborn Ltd. Partnership *vs.* Barnstable Bd. of Appeals, Housing Appeals Committee, No. 98-01, at 3 (March 5, 1999) (Stuborn).

[8]The applicable regulations concerning fundability are those in effect at the time of Delphic's application and the denial of that application by the board, 760 Code Mass. Regs. § 31.01(2) (1993), which provide as follows: "A project shall be presumed fundable if a subsidizing agency makes a written determination of Project Eligibility or Site Approval. . . ." Title 760 Code Mass. Regs. § 31.07(1)(a) (1993), in turn, states that a rebuttable presumption shall exist for "Fundability/Project Eligibility or site control" as defined in § 31.01(2).

[9]Initially, the Attorney General maintained that Middleborough had failed to raise any challenge concerning the issue of fundability at the administrative level. After oral argument in this court, the Attorney General amended this argument to state that the issue of fundability had not been raised "adequately" at the administrative level.

The record establishes that, during the administrative hearing, the committee chair permitted Middleborough's counsel to question a Delphic witness

After a public hearing, which lasted for some nine sessions, the board unanimously denied the permit, determining (among other things) that the parcel lacked adequate frontage and that it previously had been designated as one on which building could not take place. Delphic appealed from the denial of the permit to the committee. The committee held conferences with counsel, visited the proposed project site, held a de novo hearing in which it heard from witnesses for the parties and from intervening abutters,[10] and considered post-hearing submissions. See G. L. c. 40B, §§ 22-23. In July, 2002, the committee issued a written decision overturning the board's denial of the comprehensive permit and directing that the permit issue to Delphic, with certain conditions not relevant to this appeal.

In August, 2002, Middleborough sought judicial review of the committee's order in the Superior Court, pursuant to G. L. c. 30A, § 14. In April, 2004, a judge in the Superior Court allowed the defendant's motion on the pleadings, and denied that of Middleborough. See Mass. R. Civ. P. 12 (h), 365 Mass. 754 (1974). In relevant part, the judge rejected Middleborough's argument that the New England Fund loan was not a "subsidy" provided by the Federal or State government within the meaning of G. L. c. 40B, a necessary prerequisite to Delphic's right to proceed with its appeal under the act. In so holding, the judge gave considerable weight to the committee's analysis of the New England Fund program in a prior decision, Stuborn Ltd. Partnership *vs.* Barnstable Bd. of Appeals, Housing Ap-

---

briefly about fundability "more as a matter of courtesy." However, the chair also reminded Middleborough's counsel that in prehearing discussions among the committee and the parties, no "issue [had been] raised with regard to the . . . very complex issues of fundability" and that fundability was "not one of the issues . . . raised in this case." The committee chair informed Middleborough that if it intended to challenge fundability on the basis that the New England Fund did not constitute a subsidy as contemplated by G. L. c. 40B, Middleborough would be required to give Delphic's counsel time "to prepare to deal with that." Middleborough apparently did not pursue the point, and in its decision, the committee stated that Middleborough did not raise the issue of fundability "during the hearing or in its brief."

[10] Only one member of the committee, its chair, presided over the meeting. Because that member was not a "hearing officer," he was not required to issue a written report to the full committee. See *Middleborough* v. *Housing Appeals Comm.*, *supra* at 51-52.

peals Committee, No. 98-01 (March 5, 1999) (Stuborn), which we discuss *infra*. Middleborough appealed.

The Appeals Court affirmed the Superior Court's judgment. *Middleborough* v. *Housing Appeals Comm.*, *supra* at 41. However, on the question before us — whether the New England Fund financing commitment provided a government subsidy within the meaning of the act — the Appeals Court rejected "much of" the reasoning of the Stuborn decision as having been "propelled, at least in part, by policy considerations rather than exclusive adherence to the language of the statute." *Id.* at 41, 46. The Appeals Court nevertheless concluded that the New England Fund did provide a government subsidy, since the FHLBB and its debt instruments are exempt from certain Federal, State, and local taxes. See 12 U.S.C. § 1433 (2000). The Appeals Court thus reasoned that developers would receive a government benefit from a New England Fund loan in the form of tax exemptions to the FHLBB and its member banks that led to loans at reduced interest rates to entities such as Delphic. *Middleborough* v. *Housing Appeals Comm.*, *supra* at 50 ("the financial participation of the government in the form of . . . tax exemptions is sufficient to constitute a governmental subsidy for purposes of [G. L.] c. 40B"). This appeal followed.

2. *Waiver.* We consider as an initial matter claims concerning waiver made by the Attorney General, representing the committee, and by Middleborough. The Attorney General asserts that Middleborough has waived its right to contest whether funding from the New England Fund is a valid government subsidy because, during the administrative proceedings, Middleborough failed "adequately" to challenge the rebuttable presumption of fundability established by the project eligibility letter. See 760 Code Mass. Regs. §§ 31.01(2), 31.07(1)(a) (1993) (establishing rebuttable presumption of fundability on introduction of fundability letter). See notes 8 and 9, *supra*. Cf. *Hingham* v. *Department of Telecommunications & Energy*, 433 Mass. 198, 215 (2001) (issue not raised in administrative proceeding may not be raised on judicial review of proceeding). In response, Middleborough argues that the Attorney General, in turn, has waived the waiver argument by not raising it in the Superior

Court.[11] See, e.g., *Century Fire & Marine Ins. Corp.* v. *Bank of New England-Bristol County, N.A.*, 405 Mass. 420, 421 n.2 (1989) (issue raised for first time on appeal will not be considered). Middleborough also counters that, in any event, the issue of fundability is one of subject matter jurisdiction that may be raised at any time. See *Litton Business Sys., Inc.* v. *Commissioner of Revenue*, 383 Mass. 619, 622 (1981) (subject matter jurisdiction may be raised at any time).[12]

Turning first to the potentially determinative question of subject matter jurisdiction, Middleborough argues that, by statute and regulation, fundability is a "jurisdictional prerequisite to maintaining an appeal before the [committee]," and therefore is unwaivable. See, e.g., *id.* We do not agree. Subject matter jurisdiction is "jurisdiction over the nature of the case and the type of relief sought," Black's Law Dictionary 870 (8th ed. 2004), which among the various trial courts and administrative agencies "is both conferred and limited by statute." *Edgar* v. *Edgar*, 403 Mass. 616, 619 (1988). Title 760 Code Mass. Regs. § 31.01(1) provides that a developer appealing from the denial of a comprehensive permit to the committee "shall fulfill the following jurisdictional requirements: . . . (b) The project shall be fundable by a subsidizing agency under a low and moderate income housing subsidy program." The Legislature has designated the committee hearing process as the sole administrative avenue to hear a developer's challenge to a local board's denial of a comprehensive permit. See G. L. c. 40B, § 22. Thus, viewed within the context and purposes of the act, it is clear that what the department denominates as a "jurisdictional requirement" is

---

[11]The Attorney General acknowledges that in the Superior Court she did not "directly" argue waiver by Middleborough of its challenge to the New England Fund's status, and that she did so in the Appeals Court only at oral argument. The Attorney General maintains, however, that because the judge in the Superior Court "effectively relied" upon the lack of any contrary evidence of fundability when he held that Delphic's submission of a project eligibility letter established fundability under 760 Code Mass. Regs. §§ 31.01(2) and 31.07(1)(a) (1993), Middleborough cannot now raise waiver against the defendants.

[12]Because Middleborough does not challenge G. L. c. 40B itself (enabling legislation) as unconstitutional, there is no merit to Middleborough's assertion that its late raised claims properly may be considered under the exception this court announced in *Gurry* v. *Board of Pub. Accountancy*, 394 Mass. 118, 126 (1985), for "jurisdictional claims based upon constitutional challenges to an agency's enabling legislation."

more properly viewed as a substantive aspect of the successful applicant's prima facie case for entitlement to a particular government benefit, in this case, a comprehensive permit. See *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. 811, 825 (2002) (statutory reference to Federal or State construction subsidy program is "properly viewed as a statutory mechanism to determine the threshold eligibility for the developer of a housing project to seek a comprehensive permit"). See also 760 Code Mass. Regs. § 31.01(5) (1993).[13]

Indeed, the intent of the act — to streamline and accelerate the permitting process for developers of low or moderate income housing in order to meet the pressing need for affordable housing, see, e.g., *Dennis Housing Corp.* v. *Zoning Bd. of Appeals of Dennis*, 439 Mass. 71, 76 (2003) — would be severely hampered if the issue of fundability could be raised collaterally at any point to attack the validity of the grant of a comprehensive permit. Such a construction of the statute and regulations would seriously complicate a municipality's ability to determine whether existing or proposed affordable housing projects met the minimum statutory requirements.[14] Regulatory terminology notwithstanding, the issue of fundability is not one of subject matter jurisdiction that can never be waived. It is an evidentiary issue that the party opposing the comprehensive permit must rebut.

We need not discuss at length the remaining conflicting waiver arguments. Middleborough did not accept the committee chair's express invitation to pursue the question of fundability

[13]Title 760 Code Mass. Regs. § 31.01(5) (1993) provides: "Failure of the applicant to fulfill any of the requirements in 760 [Code Mass. Regs. §] 31.01(1) may be raised by the Committee, the Board, or a party at any time, and shall be cause for dismissal of the application or appeal. No application or appeal shall be dismissed, however, unless the applicant has had at least 60 days to remedy the failure." Section 31.01 was amended in August, 2001, but this provision remained unchanged.

[14]A municipality has fulfilled its minimum affordable housing obligation where "low or moderate income housing exists which is in excess of ten per cent of the housing units reported in the latest federal decennial census of the city or town or on sites comprising one and one half per cent or more of the total land area zoned for residential, commercial or industrial use or . . . the application before the board would result in the commencement of construction of such housing on sites comprising more than three tenths of one per cent of such land area or ten acres, whichever is larger, in any one calendar year." G. L. c. 40B, § 20.

or object to his statement that fundability "is not one of the is-
sues [that has] been raised in this case." The Attorney General
did not brief the waiver issue in the Superior Court or the Ap-
peals Court. Whatever the merits of any party's claim regarding
waiver, we will address the substantive question before us: it
has been fully briefed and argued, and public policy would
benefit from the elimination of any uncertainty surrounding
whether a financing commitment through the New England
Fund constitutes a valid government subsidy under the act.[15]
See *Andrews* v. *Civil Serv. Comm'n,* 446 Mass. 611, 618 (2006);
*Wellesley College* v. *Attorney Gen.,* 313 Mass. 722, 731 (1943).

3. *Fundability of subsidized housing.* a. *The New England
Fund of the FHLBB.* We begin with a summary of the relevant
features of the New England Fund of the FHLBB from
uncontested material in the Stuborn decision and the applicable
Federal statutes. See *Middleborough* v. *Housing Appeals Comm.,
supra* at 43-47.

The FHLBB is one of twelve regional banks comprising the
Federal Housing Finance Board, the latter being an "independent
agency in the executive branch of the Government." 12 U.S.C.
§ 1422a(a)(2) (2000). Each regional bank serves a discrete
geographical area within the United States, 12 U.S.C. § 1423
(2000). "Supervised" by the Federal Housing Finance Board,
each regional bank is a corporation owned by "member" banks
that have subscribed to the stock of their respective Federal
Home Loan Bank. 12 U.S.C. §§ 1422(2)(A), 1424, 1426 (2000).
Federally chartered, the FHLBB is privately capitalized,
privately owned, and managed independently of the government.
See 12 U.S.C. §§ 1426-1427 (2000). But the FHLBB's capital,
reserves, advances, surplus, and income are all exempt from
Federal, State, and local taxation, as are loans and other obliga-
tions issued by the FHLBB. 12 U.S.C. § 1433 (2000).

The New England Fund "draws its mandate" from the Federal
Housing Finance Board's general purpose "of providing funds

---

[15]The Attorney General, supported by the amici, argues that whether a financ-
ing commitment under the New England Fund is a government subsidy "could
have profound implications for the reach of the state's affordable housing law,
G. L. c. 40B," including the validity of noncash subsidy programs such as the
local initiative program, see 760 Code Mass. Regs. § 45.05 (2006), that fall
within the subsidy provisions of the act and its regulations.

for residential housing finance." Stuborn, *supra* at 15. See 12 U.S.C. § 1430(a)(2)(A) (2000). Under the New England Fund program, the FHLBB advances funds to a member bank, which in turn makes a construction loan to a developer at below-market interest rates. Stuborn, *supra* at 3. The loan may be used either for housing projects targeting those with incomes as high as 140 per cent of the area median income or for economic development projects. *Id.* The New England Fund's eligibility guidelines for affordable housing developments explicitly refer to the "commonly understood" requirement of the comprehensive permit process that one-quarter of the owners or renters have incomes that do not exceed eighty per cent of area median income. *Id.* See note 7, *supra*.

b. *Standard of review.* In reviewing the decision of an administrative agency charged by the Legislature with promulgating regulations, the standard of review is circumscribed as articulated in numerous decisions. See, e.g., *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. 615, 618 (1997). Thus, in considering whether housing financed through the New England Fund constitutes housing "subsidized by the federal or state government" within the meaning of the act, we give paramount importance to the language of the act in order to determine legislative intent. *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977) ("the statutory language itself is the principal source of insight into the legislative purpose"). Where statutory lacunae exist, the details of legislative policy are to be spelled out "in the first instance by [the] agency charged with administration of the statute." *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 654 (1982) (*Wellesley I*), quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 368 n.20 (1973). See *Wellesley I, supra,* quoting *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 441 n.22 (1971), *S.C.*, 365 Mass. 215 (1974) (in considering regulations promulgated under act, "we give great weight to a 'reasonable construction of a regulatory statute adopted by the agency charged with [its] enforcement' "). Where the statutory language is not without ambiguity, see *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 354, our deference to the agency's interpretation of the governing statute is highest. See, e.g., *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977).

A reviewing court "must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Wellesley I, supra* at 654, quoting *Consolidated Cigar Corp.* v. *Department of Pub. Health, supra* at 855. See *Leopoldstadt, Inc.* v. *Commissioner of the Div. of Health Care Fin. & Policy,* 436 Mass. 80, 91 (2002), quoting *Protective Life Ins. Co.* v. *Sullivan, supra* ("this principal is one of deference, not abdication"). Moreover, we recognize that "[w]here the focus of a statutory enactment is reform," as is true of the act, see *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 347, "the administrative agency charged with its implementation should construe it broadly so as to further the goals of such reform," *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.,* 436 Mass. 763, 774 (2002). Agency action will not be overturned unless it be proven arbitrary, unreasonable, or inconsistent with the agency's own rules. See *Finkelstein* v. *Board of Registration in Optometry,* 370 Mass. 476, 478 (1976). Last, the burden of proving the invalidity of administrative action rests with the party challenging that action. *Brackett* v. *Civil Serv. Comm'n,* 447 Mass. 233, 242 (2006).[16] With these guidelines before us, we advance to the merits.

c. *"Subsidy" under G. L. c. 40B.*[17] The Legislature did not define the term "subsidy" for purposes of the act. Initially, neither did the administrative regulations promulgated by the Department of Community Affairs (department) to implement the act. See, e.g., 760 Code Mass. Regs. § 30.02 (1978). However, between 1990 and 1991, the department promulgated

---

[16]The Attorney General has moved to strike material submitted, and factual assertions made, by Middleborough for the first time in this appeal. Because we conclude that neither the committee's ruling nor the Superior Court's affirmation of that ruling were, on the record before them, either unreasonable or an abuse of discretion, we do not rely on Middleborough's additional materials, and therefore do not address the Attorney General's point.

[17]There is no dispute that the housing at issue here will be "built or operated" by a nonprofit or limited dividend organization, and that the New England Fund is a "program to assist the construction of low or moderate income housing." G. L. c. 40B, § 20. We have stated previously that the New England Fund "is an affordable housing financing program." *Planning Bd. of Hingham* v. *Hingham Campus, LLC,* 438 Mass. 364, 367 (2003).

amendments to its then-existing regulations, defining the term "subsidy" as follows:

> "*Subsidy* means the grant, through a federal or state housing program to assist the construction of low or moderate income housing, including a local housing program approved by the Executive Office of Communities and Development, of direct financial assistance; of indirect financial assistance through insurance, guarantees, or other means; of in kind assistance; of technical assistance; or of other supportive services. The definition conforms to the legislative intent expressed in the Report of the Special Commission Relative to the Implementation of Low and Moderate Income Housing Provisions (1989) [see note 18, *infra*], and includes assistance through the Local Initiative Program, 760 [Code Mass. Regs. §] 45.00, and similar programs."

760 Code Mass. Regs. § 30.02 (1991).[18] Consistent with the broad reform purpose of the act, the department defined the term "subsidy" expansively, encompassing both direct financial support and a wide range of indirect financial and nonfinancial support. In so doing, the department did not exceed its statutory authority. See *Globe Newspaper Co.* v. *Beacon Hill Architectural*

---

[18]The Stuborn decision suggests that this definition of "subsidy" was promulgated in response to a shift in the prevailing methods of financing low or moderate income housing, from direct governmental grants in the 1970's and 1980's to "market-driven approaches" in which direct monetary-based governmental subsidies were substantially reduced. Stuborn, *supra* at 6-7.

The Legislature responded in prompt fashion to this shift, establishing in 1987 a special commission relative to the implementation of low and moderate housing provisions. The commission, known as the Grace Commission (named after one of its cochairs, Representative Augusto F. Grace), was tasked with studying the implementation of the act and recommending improvements. Res. 1987, c. 4. The Grace Commission issued written findings and recommendations in April, 1989. Among the Grace Commission's findings was that there was significant support for the development of affordable housing in the Commonwealth that did not need to rely on "conventional" State and Federal subsidizing mechanisms. Report of the Special Commission Relative to the Implementation of Low and Moderate Housing Provisions 20 (April, 1989). The Grace Commission recommended permitting communities to craft their own plans for affordable housing production by allowing "nontraditional subsidy programs or local initiatives to count toward the ten percent threshold." *Id.* at 7. Moreover, the Grace Commission expressly envisioned that its recommendations would be implemented "through the regulatory process." *Id.* at 1.

*Comm'n,* 421 Mass. 570, 583 (1996) (administrative agency "has jurisdiction to establish regulations that bear a rational relation to the statutory purpose"); *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.,* 401 Mass. 172, 176 (1987) ("regulation may be authorized though not traceable to specific statutory language, [and] powers granted include those reasonably implied").

Then, in the Stuborn case, the committee was asked to resolve the issue that Middleborough now raises on appeal: whether the New England Fund met the regulatory definition of a government subsidy for the purposes of G. L. c. 40B.[19] In the Stuborn decision, the committee began by noting its precedent of reading the statute and regulations liberally to effectuate the Legislature's aims, in order to allow "the entire comprehensive permit process to evolve with the changing world of housing subsidies." Stuborn, *supra* at 6. The committee considered whether the New England Fund met the four-part test for determining whether an entity is a governmental "instrumentality" set out in *Massachusetts Bay Transp. Auth. Retirement Bd.* v. *State Ethics Comm'n,* 414 Mass. 582, 587 (1993). Applying that test, the committee concluded that the New England Fund had sufficient characteristics of a government agency to qualify as a Federal program.[20] Stuborn, *supra* at 15-16.

The committee determined that the financing mechanism of the New England Fund provided a government subsidy because "financing will be provided at a low interest rate," and because "it is generally understood that 'the funds handled by these banks

---

[19]Middleborough points out that three years prior to the Stuborn decision, the committee determined that the New England Fund did not provide a subsidy within the meaning of the act. The committee directly addressed this point in the Stuborn decision, noting that "the [New England Fund] has been modified since [then], and [the Stuborn case] presents a further opportunity to review whether the [New England Fund] conforms to the requirements of the comprehensive permit process." Stuborn, *supra* at 2.

[20]While Federal courts have reached different conclusions as to whether a Federal Home Loan Bank is a private or a public entity, in the Stuborn decision, the committee determined that the FHLBB is most properly characterized as a "hybrid entity" that "may be considered public or private depending on the context in which the issue arises." Stuborn, *supra* at 14. See, e.g., *Department of Community Servs.* v. *Massachusetts State College Bldg. Auth.,* 378 Mass. 418, 425 (1979) (organization may be "a hybrid entity, possessing attributes both of a private corporation and an executive agency of the Commonwealth").

are . . . public funds." *Id.* at 11-12, quoting *Fahey* v. *O'Melveny & Myers*, 200 F.2d 420, 445 (9th Cir. 1952), cert. denied sub nom. *Mallonee* v. *Fahey*, 345 U.S. 952 (1953). The committee also pointed to the broad definition of the term "subsidy" endorsed in *Wellesley I, supra* at 655 (subsidy not limited to grants of money, but includes "[h]elp, aid, [or] assistance" generally), noting that in that case, *id.*, this court held that mortgage financing from the Massachusetts Housing Finance Agency (MHFA) constituted a "subsidy" under G. L. c. 40B. The committee determined that the financing mechanism of the New England Fund "is a public subsidy quite similar to MHFA financing, and constitutes a subsidy" within the meaning of the act and its regulations. Stuborn, *supra* at 12. The committee concluded that the New England Fund financing mechanism constituted "the sort of affordable housing subsidy program that is crucial to current efforts to fill the need for affordable housing." *Id.* at 7.

The Appeals Court disavowed the reasoning of the Stuborn decision, holding that the act "requires not just governmental involvement, but a governmental subsidy," *Middleborough* v. *Housing Appeals Comm.*, 66 Mass. App. Ct. 39, 48 (2006), and that "the concept of a subsidy" requires "that something of economic value is made available, and that it be provided, at least in this context by the Federal or State government." *Id.* at 46. The Appeals Court concluded that none of the factors cited by the committee in support of its conclusion in the Stuborn decision persuasively demonstrated that the New England Fund provided a government subsidy under the act, *id.* at 47-48, reasoning that "if the Federal or State government does not contribute something of value to the effort, there is nothing that qualifies as a government subsidy," *id.* at 49. The Appeals Court then looked to "other features" of the New England Fund programs as operated by the FHLBB and reasoned that the tax-exempt status of both the funds held by the FHLBB and the loans it provided from the New England Fund eased the tax burden on the FHLBB, "thereby increasing its ultimate profits and enabling it more easily to make loans at favorable rates to its members." *Id.* at 49-50. As such, the Appeals Court concluded that the tax exemptions

were "sufficient to constitute a governmental subsidy" for purposes of the act. *Id.* at 50.[21]

We do not disagree with the Appeals Court to the extent that it holds that an exemption from taxation constitutes a government subsidy under the act. See *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank,* 356 Mass. 202, 209 (1969) (noting that exemption of MHFA financial instruments from certain State and Federal taxes permitted MHFA to make mortgage loans "at interest [rates] lower than those which would be charged if the borrower were to obtain funds in the general mortgage market"). We conclude, however, that the Appeals Court should not have repudiated the reasoning of the Stuborn decision and, by necessary implication, the committee's reasoning in this case. The act and its regulations permit many kinds of government subsidies, and we disagree with the Appeals Court's rejection of the committee's more expansive interpretation of the fundability requirements of the act.

First, the broadly meliorative purpose of the act is evident in the Legislature's directive that low or moderate income housing be "subsidized by the federal or state government under *any* program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute" (emphasis added). G. L. c. 40B, § 20. See, e.g., *United States* v. *Gonzales,* 520 U.S. 1, 5 (1997) ("the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind' "). Second, as we discussed earlier, the scope of review of an administrative decision pursuant to G. L. c. 30A, § 14, leaves little room for appellate discretion. As we noted, the agency's decision must be upheld if supported by "such evidence as a reasonable mind might accept as adequate to support a conclusion," *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 376 (1973), and we must indulge all rational presumptions in favor of the validity of the agency's determinations. *Wellesley I, supra* at 657. Our deferential standard

[21]By reaching the question whether the New England Fund program constituted a government subsidy, see note 19, *supra,* and holding in the affirmative, both the Superior Court and the Appeals Court implicitly reached and answered the threshold question whether the Federal Home Loan Bank constituted a government entity for the purposes of G. L. c. 40B, § 22. See note 20, *supra.*

of review "does not permit a court to treat the proceeding [under G. L. c. 30A] as a trial de novo on the record which was before the administrative board. A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.*, quoting *Labor Relations Comm'n* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971).

Next, this court itself has said that the term "subsidy" in the act must be read expansively. See *Wellesley I, supra* at 655 (subsidy not limited to grants of money, but includes "[h]elp, aid, [or] assistance" generally). See also, e.g., *Charlesbank Apartments, Inc.* v. *Boston Rent Control Admin.*, 379 Mass. 635, 638 (1980) (mortgage insurance constitutes subsidy). In *Wellesley I, supra* at 655-656, we held that a low-interest loan from a quasi governmental State entity (in that case, the MHFA) constituted a subsidy under the act. In the Stuborn decision, the committee determined that the New England Fund subsidizes low or moderate income housing when the FHLBB advances funds from the New England Fund to one of its member banks, "which in turn makes a construction loan to a developer [at] *a below-market interest rate*" (emphasis added). Stuborn, *supra* at 3.

We see no meaningful distinction between the low-interest loan that constituted a subsidy in *Wellesley I* and the low-interest loan provided by the New England Fund in this case. In both cases, a program of the Federal or State government lent funds for affordable housing construction at below-market interest rates. In both cases it appears that below-market interest rate loans were made possible by the lenders' exemption from certain forms of taxation. It was thus reasonable under the regulation, the intent of the statute, and the prior jurisprudence of this court for the committee to conclude that the financing commitment through the New England Fund, with its below-market interest rate loan, constitutes a "subsidy" for purposes of the act.

Viewed in light of the statutory mandate, our deference to administrative actions, and our prior decisions, we cannot say that the New England Fund's below-market interest rate loans do not constitute a subsidy for purposes of the act. Nor do we deem unreasonable the committee's conclusion that a government

subsidy is involved where a legislatively-created and monitored entity (here, the FHLBB) advances construction funds to a developer of affordable housing at below-market interest rates to advance the legislative purpose of supporting and stabilizing the financing of residential housing. The committee's reasoning in the Stuborn decision is consonant with the Legislature's remedial purposes and broad grant of authority to the department. Neither the statute nor the department's regulations interpose any of the additional restrictions on the source of the funds, the scope of the program, or the degree of subsidy that Middleborough would have us read into the act. See *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 378 (act relies on standards set by State and Federal entities to "define the requisite property interest for a permit in terms of the selected financing agency's property interest requirements").

We conclude that the committee's decision in this case, and in the Stuborn decision that preceded it, is not "contrary to the plain language of the statute and its underlying purpose," *Leopoldstadt, Inc.* v. *Commissioner of the Div. of Health Care Fin. & Policy*, 436 Mass. 80, 91 (2002), quoting *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. 615, 618 (1997), and is due substantial deference from this court. We decline to overrule the committee's determination, under its reasoning in the Stuborn decision, that the New England Fund program constitutes a valid subsidy under the act and its implementing regulations.[22]

4. *Conclusion.* For the reasons stated, the Superior Court properly allowed the defendants' motion for judgment on the

[22]The Attorney General distinguishes between an "old" New England Fund, which existed as of the date of Delphic's application, and a "new" New England Fund, as currently operating, arguing that both qualify as providing the requisite statutory subsidies. According to the Attorney General, under the "old" New England Fund, either an affordable housing, nonprofit organization or a municipality enforced the requirements that a certain percentage of the project be dedicated to low or moderate income housing for at least fifteen years. Under the "new" New England Fund, "regulations now provide for state-level supportive services, requiring that a state-approved entity must both approve a project's eligibility and monitor subsequent compliance with affordable housing requirements." See 760 Code Mass. Regs. § 31.01(2)(g) (2004). While we are concerned here with the "old" New England Fund as a subsidizing agency under the act and the implementing regulations in effect as of the date that Delphic submitted its application, it would appear that if the "old" New England Fund passes muster, as it does, so too must the "new."

pleadings, and properly denied the motion for judgment on the pleadings of Middleborough.

*Judgment affirmed.*